UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SHEILA M. JONES                        CIVIL ACTION

VERSUS                                 NUMBER: 11-2288

MICHAEL J. ASTRUE,                     SECTION: "R"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB").  (Rec. docs. 15, 16).

Sheila M. Jones, plaintiff herein, filed the subject application for DIB on January 6, 2010, with a protective filing date of October 28, 2009, alleging disability as of February 7, 2009. (Tr. pp. 102-103, 120).  In a Disability Report that appears

in the record, the conditions resulting in plaintiff's inability to work were identified as mitral and aortic valve disease, diabetes, arthritis, depression, mental illness, pain to a right joint, obesity, loss of memory and vision, neck pain, right leg injury, chest pain, and breathing problems. (Tr. pp. 143-155). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on April 15, 2010. (Tr. pp. 58-61). Pursuant to her request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on September 14, 2010 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 64-65, 31-55). On November 24, 2010, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 12-30). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision on August 12, 2011, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-5). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In the "LAW and Argument" section of her cross-motion for summary judgment, plaintiff does not set forth any specific, distinct claims for review but instead presents a number of one and two-sentence challenges to the Commissioner's decision which lack

2

citation to the administrative record. (Rec. doc. 15-1, pp. 3-7).

Essentially, plaintiff complains that the ALJ's residual functional

capacity ("RFC") assessment did not include limitations that had

been noted by the Administration's Medical Consultant ("MC"); that

the ALJ accorded insufficient weight to the plaintiff's complaints

of right-sided extremity pain, back pain, and neck pain; that the

ALJ failed to arrange for a physical and mental examination of her

under 20 C.F.R. §404.1529 and SSR 96-7; that the ALJ erroneously

placed little importance on the objective diagnoses as a whole and

their combined impact of plaintiff's ability to maintain

employment; that the ALJ gave insufficient weight to a physician's

opinion that she was disabled; and, that the ALJ did not impose any

restrictions in holding objects despite EMG evidence of carpal

tunnel syndrome ("CTS"). (Id.).  Relevant to a resolution of those

issues are the following findings that were made by the ALJ:

1.   [t]he claimant meets the insured status requirements of
     the Social Security Act through December 31, 2013.

2.   [t]he claimant has not engaged in substantial gainful
     activity since February 7, 2009, the alleged onset date
     (20 CFR 404.1571 et seq.).

3.   [t]he claimant has the following severe impairments: torn
     medial meniscus in [the] right knee, degenerative disc
     disease of the cervical spine, hypertension, diabetes
     mellitus, obesity, and depression (20 CFR 404.1520(c)).

4.   [t]he claimant does not have an impairment or combination
     of impairments that meets or medically equals one of the
     listed impairments in 20 CFR, Part 404, Subpart P,

Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) but she can only occasionally operate a right foot control, and work that is limited to simple, routine and repetitive tasks.

6.    [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    [t]he claimant was born on March 3, 1967 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (20 CFR 404.1563).

8.    [t]he claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.    [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.   [t]he claimant has not been under a disability, as defined in the Social Security Act, from February 7, 2009, through the date of this decision (20 CFR 404.1520(g)).

                                        (Tr. pp. 17, 19, 20, 24, 25).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's

4

decision, and (2) whether the decision comports with relevant legal standards.  <u>Anthony v. Sullivan</u>, 954 F.2d 289, 292 (5th Cir. 1992); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner.  <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that she is disabled within the meaning of the Social Security Act.  <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

    1.   an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

    2.   an individual who does not have a "severe impairment" will not be found to be disabled.

    3.   an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

    4.   if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

    5.   if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that

she has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist.  Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)).   Once  the  Commissioner  demonstrates  that  the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

The documentary evidence admitted in the proceedings below[1]/ includes a report from Total Health Solutions, LLC in Gulfport, Mississippi, where plaintiff was seen on October 1, 2008 by Dr. Steve Morris for complaints of chronic cervical neck pain with limitations in the range of motion.  The pain was daily but was said to be well-controlled with medication, "2" on a scale of 1 to 10, and with a good activity level.  The pain was related to a herniated disc at C6-7, without spinal compromise, and plaintiff

---

[1]/ The documentary evidence is fairly voluminous and some of it pre-dates the period of time that the Commissioner is charged with developing a claimant's medical history.  See 20 C.F.R. §404.1512(d).  For that reason, and because a number of plaintiff's challenges to the Commissioner's decision can be resolved with simple references to the record, the Court will discuss only the evidence that was specifically cited by plaintiff and that which is necessary to resolve the challenges at hand.

had improved functioning at home and at work and an improved quality of life and thus preferred to be medically managed rather than undergoing surgery.  Plaintiff did not appear sedated, had no side-effects from medication, and demonstrated a clear affect with no aberrant behavior. Medications included Lorcet, Soma, Xanax, Atenolol, and over-the-counter pain relievers.  The impression was cervical radiculopathy at the left and right arm levels, cervicalgia, a herniated disc at C6-7, and hypertension.  Range of motion exercises were recommended and plaintiff was continued on her medication regimen.  (Tr. pp. 433-436).

Plaintiff returned to Dr. Morris on January 21, April 14, and May 12, 2009 whose offices by that time had been moved to Waveland. The reports documenting those visits were the same as the one that was generated on October 1, 2008. (Tr. pp. 429-432, 425-428, 421-424).  On May 19, 2009, plaintiff was seen by Nurse Practitioner ("NP") Scharalda Jeanfreau of the Daughters of Charity Services for complaints of right knee pain of three weeks duration, dry mouth, frequent urination, and fatigue.  Contrary to Dr. Morris' note one week earlier which made no mention of knee pain and indicated that plaintiff had good analgesic pain control, NP Jeanfreau stated that plaintiff experienced no relief with pain management medications. There was minimal localized swelling of the leg and mild to moderate tenderness on palpation or ambulation  of the right leg

but no crepitus and leg maneuvers were normal.  The assessment was valvular heart disease, familial hypercholesterolemia, obesity, and depression.  Various medications were prescribed including Naproxen and Tramadol. (Tr. p. 505).  On June 4, 2009, plaintiff was seen by a social worker at Daughters of Charity for complaints of continued depression.  The assessment was moderate recurrent major depression and plaintiff was to request that her pain management specialist, Dr. Morris, address it at her next visit with him. (Tr. p. 504).

Plaintiff returned to Dr. Morris on June 9, 2009 who added right knee pain to the four other conditions that had previously been identified on her "problem list".  Once again it was noted that plaintiff was experiencing good analgesic control of her pain with improved functioning with the activities of daily living and at work.  An examination of the right knee revealed no swelling or deformity, a full range of motion, and a stable gait.  Plaintiff was continued on her medication regimen. (Tr. pp. 417-421).  On June 30, 2009, plaintiff was seen again by NP Jeanfreau to obtain the results of some tests that had previously been conducted.  An MRI was to be ordered for complaints of right knee pain for the previous two months following a reported fall in December of 2008. (Tr. p. 504).  On August 4, 2009, plaintiff was seen by Dr. Morris who added non-insulin dependent diabetes mellitus ("NIDDM") to the list of plaintiff's problems and questioned whether plaintiff's

right knee pain was osteoarthritic in nature as opposed to a ligamental injury. The control of plaintiff's pain was still said to be good and she was continued on her medications. (Tr. pp. 413-416).

Plaintiff was seen again by NP Jeanfreau on August 11, 2009 who noted the recent diagnosis of NIDDM and added Metformin to plaintiff's medications. Right knee pain continued. The assessment was valvular heart disease, familial hypercholesterolemia, obesity, NIDDM, and an unspecified spinal cord disorder. (Tr. pp. 502-503). At her next office visit with Dr. Morris, plaintiff's problem list was the same as the previous visit but it was noted that she had mild swelling to the right knee, point tenderness medially and laterally with no deformity, an unspecified limitation in range of motion, and a gait favoring the tenderness. The same medications were continued. (Tr. pp. 306-309, 409-412). Plaintiff's chief complaint was identified as NIDDM when she was next seen by NP Jeanfreau on September 15, 2009. The assessment was obesity and NIDDM and related testing materials and Naproxen were prescribed. (Tr. p. 502).

The administrative record contains two treatment notes from Dr. Morris dated September 29, 2009, one of which includes NIDDM and diastolic dysfunction in plaintiff's problem list while the other one does not. (Tr. pp. 310-313, 396-399). Both notes reflect

that plaintiff's chief complaints were cervical chronic neck pain and right knee pain with an unspecified limitation in range of motion. (Id.). The treatment notes also indicate that plaintiff's pain continued to be well-controlled with medication, at a level of "2" on a scale of 1 to 10. Once again, plaintiff was maintained on her medication regimen. (Id.). Plaintiff was seen again by NP Jeanfreau on October 20, 2009 for propulsive diarrhea and general GI distress and apparently having suffered a fall. No musculoskeletal findings were reported. The assessment was valular heart disease, vaginitis, familial hypercholesterolemia, obesity, and diabetes mellitus. The dosage of plaintiff's diabetes medication was adjusted and she also received a refill of Naproxen. (Tr. pp. 500-502). The treatment note documenting plaintiff's return to Dr. Morris on October 27, 2009 was the same as her previous visit. The impression was cervical radiculopathy at the left/right arm levels, cervicalgia, a herniated disc at C6-7, hypertension, right knee pain, and obesity. Plaintiff was continued on Lorcet, Soma, Xanax, Atenolol, and over-the-counter pain relievers. (Tr. pp. 288-291, 392-395).

Plaintiff met with the social worker from Daughters of Charity again on November 5, 2009 and reported a number of recent psychosocial and medical stressors including the disability of her boyfriend due to a gunshot wound, her unemployment for the previous

year, problems with her son at school, the recent diagnosis of diabetes, and pain to the right knee. Psychiatric history was positive for a suicide attempt by overdose eleven years earlier. Plaintiff exhibited a depressed mood, sad affect, and passive suicidal ideation but with no plan. She was prescribed Citalopram, was to begin individual psychiatric therapy, and was counseled on stress relaxation techniques and other strategies to better address her stressors. (Tr. pp. 498-500). Plaintiff was seen by NP Jeanfreau on December 1, 2009 for follow-up of her diabetes and a four-week history of cramps in her right hand, usually in the afternoon, as well as a tendency to drop things. She had completed a course of Flagyll and was started on Neurontin for pain management. Plaintiff had weakness in the hands, the right more than the left, but with an adequate range of motion. There was pinpoint tenderness in the shoulders anteriorly but with a full range of motion. The assessment was vaginitis, obesity, and diabetes; Metformin was to be resumed gradually. (Tr. pp. 497-498).

Plaintiff's psychiatric condition was essentially unchanged when she returned to her social worker on December 10, 2009 as she continued to cope with the challenges in her life. She was to arrange for treatment from another psychiatrist due to a long waiting list to see Dr. Ehrensing. Plaintiff's mood was unhappy and depressed and her affect was sad but she exhibited good eye

12

contact and had no psychotic symptoms or suicidal or homicidal ideations.   The assessment was depression.   Plaintiff reported doing "OK" on medication but that she had not been able to take care of herself due to the ongoing challenges in her life. Plaintiff was counseled on the importance of self-care and stress relaxation techniques.   A follow-up appointment was to go forward on December 31, 2009. (Tr. pp. 496-497).

On December 17, 2009, plaintiff was seen again by Dr. Morris and her condition was the same.   Good pain control was again reported and plaintiff was continued on her medication regimen. (Tr. pp. 292-295, 388-391).   As scheduled, plaintiff had a follow-up appointment with her social worker on December 31, 2009 and the dosage of Citalopram was adjusted after consultation with a physician. Despite the challenges in her life, plaintiff indicated that her prescribed medication left her calmer and she was going out more with friends.   Plaintiff had a sad/unhappy mood and affect and suicidal ideations were limited to passive thoughts with no plan or intent.   The assessment was depression due to multiple psychosocial stressors; an expedited psychiatric consultation was to be sought. (Tr. pp. 495-496).

Yet another visit with Dr. Morris went forward on January 15, 2010 and to the problem list from the previous visit were added an oblique tear of the body and posterior horn of the medial meniscus

13

in the right knee, depression, NIDDM, and diastolic dysfunction. The body of the doctor's note from this date reflects that plaintiff's cervical pain and bilateral knee pain, the right greater than the left, persisted but that they continued to be well-controlled with medication.  The note also indicates that plaintiff had undergone an MRI of the right knee on January 7, 2010 which revealed the meniscus tear.  Once again, plaintiff was continued on her medications. (Tr. pp. 296-300, 383-387).

Plaintiff returned to NP Jeanfreau on January 26, 2010 for follow-up care of her diabetes.  She was said to be doing "quite well" with that condition but she was experiencing abdominal pain, frequent loose stools, and daily knee pain that left her feeling unsteady with walking.  Plaintiff had also undergone testing at a Neurology Clinic and lupus was mentioned as a possibility. Abnormal findings were noted on examination of the abdomen.  The plan included an abdominal ultrasound, a trial of Bentyl, a referral to an orthopedist, a host of routine tests, and adjustments to plaintiff's medications. (Tr. pp. 494-495).

Pursuant to a referral from Daughters of Charity, on February 3, 2010 plaintiff underwent a psychosocial evaluation at the New Orleans East Behavioral Health Center.  Symptoms for the previous six months included crying spells, increased appetite, nightmares, decreased motivation, irritability, and decreased concentration and

14

memory. Psychosocial stressors included health issues, the death of her mother and brother since Katrina, relationship conflicts with her daughter, unemployment, and financial issues.  Plaintiff was living with her son and brother at the time, having gotten divorced one year earlier.  Prior arrests/convictions were for theft six years earlier and for possession of controlled substances one year earlier.  Spare time was spent cleaning, performing household tasks, watching TV, and playing bingo.  Her enumerated goal was to lose weight. (Tr. pp. 454-457).

Plaintiff also underwent a psychiatric evaluation on that same day by Dr. MacKenna.  Plaintiff admitted to opiate and benzodiazepine use several years earlier and she related her earlier controlled substances arrest.  She also advised the evaluator that she obtained prescription drugs from Dr. Morris in Mississippi once per month at her expense even though she was on Medicaid.  Plaintiff's behavior was guarded but she had a full affect and an appropriate mood.  There were no suicidal or homicidal ideations or delusions.  Insight and judgment were limited by drug use.  The doctor described plaintiff as a forty-two year-old woman with vague signs and symptoms of depression who had a history of doctor shopping and illegal activity related to Hydrocodone, Xanax, and Soma, traveling to Mississippi and obtaining the drugs for cash once per month from a pain management

doctor who had to leave the state.  The diagnosis was as follows:
Axis I - depression (not otherwise specified), opiate and
benzodiazepine abuse, rule out opiate and benzodiazepine
dependence; Axis II - deferred; Axis III - diabetes mellitus,
hypertension, and pain; Axis IV - employment, health, and economic
problems; and, Axis V - a GAF of 60 with a guarded prognosis.
Plaintiff was prescribed Lexapro and Vistaril and was to decrease
the use of Xanax.  Testing and follow-up care were to be scheduled
but plaintiff was very resistant to recommended drug counseling.
(Tr. pp. 457-461).

On February 5, 2010, plaintiff completed the Administration's
"Function Report-Adult" form which elicited information about her
capabilities.  An average day was described as rising, tending to
hygienic needs, eating breakfast, taking medication, and then lying
down to watch TV.  Around noon, plaintiff would eat lunch, take
additional medication, and lie down to watch more TV until her son
arrived home from school.  The two would then visit for a time and
eventually eat dinner, following which plaintiff would talk on the
phone, bathe, and then watch TV until she fell asleep.  Sleep was
limited to about four hours per night.  Plaintiff experienced hand
pain or cramps when combing or brushing her hair and she sometimes
forgot to take her medication.  She could prepare meals but ate a
good amount of fast food.  Plaintiff could do some cleaning and

laundry but her brothers and son performed the majority of those tasks as she was likely to tire or get out of breath quickly.  She could go out alone, drive a car, go shopping, and pay bills and handle finances.  Interests included watching TV, talking on the phone, watching movies, and going to church weekly but she tended to stay at home due to stress, depression, and pain.  Plaintiff's medical problems affected nearly all of the enumerated activities of daily living and she estimated that she could walk only one block before needing to rest for twenty to thirty minutes.  As a result of her various conditions, plaintiff was increasingly tearful, depressed, and fatigued. (Tr. pp. 157-165).

On February 10, 2010, plaintiff was seen for an orthopaedic evaluation by Bryan Seely, a Physicians Assistant ("PA") with the Tulane University Hospital & Clinic.  Plaintiff reported having fallen on her right knee in December of 2008 and experiencing pain to that joint since that time.  However, there had not been any mechanical problems although the pain that she experienced was proportional to the time that she spent on her feet.  On the day of the evaluation, plaintiff described her pain as sharp in nature and at a level of "7".  X-rays taken at the time revealed minimal degenerative changes but no fractures or dislocations. Plaintiff had tenderness to palpation along the medial joint line and some crepitus with flexion and extension but range of motion was within

17

normal limits.  Based upon the results of an MRI report plaintiff had brought to the evaluation the assessment was a medial meniscus tear and chondromalacia of the right knee.  Plaintiff was administered an injection in the knee, was prescribed physical therapy, and was to be referred to Dr. Billings to discuss surgical options. (Tr. pp. 589-590, 602-603).

Plaintiff returned to Dr. Morris on February 15, 2010 for further pain management. Despite the results of the January 7, 2010 MRI being cited in the "Diagnostic Studies" portion of the treatment note, the meniscus tear was omitted from plaintiff's problem list.  Otherwise, the note is almost identical to those from previous visits with plaintiff's pain said to be well-controlled with medication.  Plaintiff's medications were refilled. (Tr. pp. 301-305, 378-382).  She was next seen by her social worker at Daughters of Charity on March 4, 2010 and her condition was unchanged with many life challenges and issues with her fifteen year-old son.  Plaintiff declined returning to Dr. MacKenna but she did have an appointment with Dr. Ehrensing at the end of the month. She had a depressed/unhappy mood and a tearful affect but there were no suicidal or homicidal ideations, no psychotic symptoms, and her thoughts were goal directed. (Tr. p. 493).

On March 9, 2010, plaintiff was seen again by NP Jeanfreau for follow-up of her diabetes.  At that time she reported various

genitourinary symptoms and continued intermittent knee pain that responded to medication.  Aside from the pain management drugs that were prescribed by Dr. Morris plaintiff's medications at the time included Hydrochlorothiazide, Glipizide, Lovastatin, Atenolol, Naproxen, Citalopram, and Dicyclomine.  Plaintiff's height was measured at 5'5" and she weighed 287.6 pounds.  The assessment was abdominal pain, amenorrhea, knee pain, urge incontinence, obesity, and diabetes.  Urinalysis was scheduled and plaintiff was prescribed Oxybutynin. (Tr. pp. 492-493).

Later that same day plaintiff was seen by Dr. Roger Kelley of the Tulane Neurology Clinic for re-evaluation.  She was on a course of physical therapy to lessen her right knee symptoms but she complained of chronic pain to the right wrist and right proximal upper extremity that was brought on by various activities and was not noted at rest.  Nevertheless, she had a good range of motion to the joints in the upper and lower extremities with no evidence of joint inflammation. Plaintiff had good muscle tone and strength throughout with no atrophy and fine finger movement was done with no problems.  Sensation was good throughout except for the right lateral femoral cutaneous nerve.  The Tinel's sign was negative bilaterally as was a Babinski response and no significant neck discomfort was noted on a range of motion assessment. Dr. Kelley had a long discussion with plaintiff regarding her ongoing pain in

light of the absence of clear evidence of cervical or lumbodorsal radiculopathy or CTS.  A diet and exercise program was recommended. EMG and nerve conduction studies of the right upper and left lower extremities were to be scheduled as was a rheumatology evaluation with a further follow-up evaluation to go forward in three to four months. (Tr. pp. 540-542).

At another counseling session with her social worker on March 11, 2010, plaintiff was anxious over an upcoming test for lupus. Her participation in the food stamp program had been discontinued but she continued to receive unemployment benefits as well as child support payments.  Plaintiff's mood was characterized as unhappy, depressed, and concerned and her affect was sad.  She was counseled on some available resources and was to follow-up in two weeks. (Tr. pp. 491-492).

On March 18, 2010, an Administration physician, Dr. Doris LeBlanc, reviewed plaintiff's file for evidence of a mental disorder and set forth her findings in a "Psychiatric Review Technique" form.  There, Dr. LeBlanc indicated that plaintiff's conditions had been measured against the criteria of Sections 12.04 and 12.06 of the Listing of Impairments but ultimately concluded that her depression and anxiety were not severe and that her treatment history did not suggest a significant mood disorder. In doing so, the doctor opined that plaintiff had a mild restriction

in the activities of daily living and mild difficulties in
maintaining concentration, persistence, and pace but that she had
no functional limitations in the other two domains. (Tr. pp. 334-
347). On March 22, 2010, plaintiff underwent a bilateral upper
extremity and a right lower extremity nerve conduction study as
well as an EMG of the right upper and lower extremity.  That
testing produced results consistent with right lateral femoral
cutaneous neuropathy and a mild right and borderline mild left CTS
but no EMG evidence of right cervical or right lumbosacral
radiculopathy. (Tr. p. 546).

Plaintiff was seen again by PA Seely on March 29, 2010 for
concerns over neck pain of several days duration after doing a good
deal of housecleaning over the weekend. She reported radicular pain
down both arms at times and pain and numbness in the hands.
Plaintiff rated her pain as a "7" and sharp in nature.  Some
restricted range of motion with flexion and extension was noted and
rotation to the right was limited secondary to pain.  Rotation to
the left was unrestricted and upper extremity range of motion was
normal bilaterally but plaintiff did have some tenderness to
palpation around the rhomboid muscles.  The assessment was
decreased range of motion/muscle spasm of the cervical spine.  To
plaintiff's physical therapy for her knee were to be added cervical
spine range-of-motion exercises as well as postural exercises and

education.   (Tr. pp. 587-588).   On April 8, 2010, plaintiff was seen again by a Daughters of Charity social worker and her condition was unchanged.   Plaintiff had discontinued the medication that had been prescribed by Dr. Ehrensing after experiencing seizure-like symptoms.   Interpersonal challenges with family members continued.   Plaintiff's mood was characterized as unhappy/upset and her affect was congruent with her mood but she had no psychotic symptoms or suicidal or homicidal ideations.   The assessment was depression and an appointment with Dr. Ehrensing was to be scheduled. (Tr. p. 490-491).

On April 13, 2010 plaintiff returned to Dr. Morris for her monthly office visit.   Despite stating that plaintiff's pain continued to be well-controlled with medication at a level of "2", Dr. Morris for the first time indicated that plaintiff was completely disabled due to the nature of her medical problems.   And despite unremarkable findings upon physical examination, plaintiff was said to be suffering from lung disease despite no mention of that condition appearing in the problem list.   Plaintiff was continued on her medication regimen. (Tr. pp. 368-372).   The following day, an Administration MC reviewed plaintiff's file and set forth his findings in a "Physical Residual Functional Capacity Assessment" form, identifying the primary diagnosis as chronic right knee pain, a secondary diagnosis of hypertension and diabetes

mellitus, and obesity as another alleged impairment. There, the MC indicated that plaintiff could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds; could sit, stand, and/or walk for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could never climb a ladder/rope/scaffolds, could occasionally climb a ramp/stairs and crouch, and could frequently perform other postural maneuvers; had no manipulative, visual, or communicative limitations; and, was to avoid concentrated exposure to extreme cold and heat. Ultimately, plaintiff was deemed to be capable of performing light-level work. (Tr. pp. 349-356).

Plaintiff was followed for her diabetes by NP Jeanfreau on April 20, 2010. Presenting symptoms included neck stiffness and pain, stress incontinence, knee and back pain, an itching right foot, and generalized pain in the thighs. Plaintiff had been started on Effexor and the dosage was being adjusted to a more effective level. The assessment was valvular heart disease, urge incontinence, familial hypercholesterolemia, obesity, diabetes, a spinal cord disorder, and depression. Various medications were prescribed and testing was ordered, including MRI studies of the lumbar and cervical spines. (Tr. pp. 489-490).

On May 3, 2010, plaintiff was seen again by PA Seely for monitoring of her right knee and neck pain. While the neck pain

23

was improving with physical therapy, the same could not be said for
her knee pain which was still at a level of "7" and sharp in nature
making it difficult for her to walk and to stand for long periods
of time.  Upon physical examination, the range of motion to the
right knee was within normal limits but plaintiff did have
significant tenderness to palpation along the medial joint line but
no swelling or joint effusion was noted.  All ligaments were
stable.  The assessment was resolving cervical spine pain and
continued right knee pain/medial meniscus tear.  Plaintiff was
administered an injection to the knee in the hope that that would
decrease her symptoms. (Tr. pp. 585-586).

On May 6, 2010, plaintiff underwent a follow-up psychiatric
evaluation by Dr. Rudolph Ehrensing but much of the first page of
the two-page treatment record is obscured by a transmittal "Post-
It" note.  From what can be gleaned from the document it appears
that discussions were had over an array of events occurring in
plaintiff's life including her being more forceful with her
daughter.  On mental status examination, plaintiff was very well
groomed, calm, and future-oriented, describing herself as more
assertive and not a "pushover".  The diagnosis was major depression
and generalized anxiety disorder versus panic disorder.  Plaintiff
was prescribed Citalopram, Effexor, and Xanax. (Tr. pp. 522-523).
Plaintiff had her regular visit with Dr. Morris on May 11, 2010 and

24

his treatment note from that date is identical to the one that was generated on the previous visit. (Tr. pp. 373-377).

On June 8, 2010, plaintiff was seen by Dr. Gayle Pletsch to obtain the results of the EMG and related testing. She reported occasional shooting pains down the right anterior thigh but the Neurontin that had previously been prescribed was controlling her pain quite well and injections had helped her markedly. Plaintiff still experienced some tingling in the hands when using the computer or cooking and sometimes her hand locked up. She had 5/5 strength throughout, sensation was intact, and gait was normal. Plaintiff did have a fine bilateral tremor with her hands outstretched. The assessment was meralgia paresthetica. The doctor recommended that plaintiff wear loose-fitting clothing and engage in weight loss; use Blu-Emu and hand braces for relief from CTS symptoms; and, was counseled on treatment options for her tremor if that became more problematic. (Tr. pp. 543-545, 560). On that same day plaintiff saw Dr. Morris again for pain medication refills. (Tr. pp. 363-367). She was also seen by NP Jeanfreau where she was administered an injection to the hip which provided some pain relief. Plaintiff's weight was down to 285.2 pounds and she appeared more relaxed. The assessment was familial hypercholesterolemia and diabetes mellitus. (Tr. p. 488). Refills of more pain management medications were authorized by Dr. Morris

25

on July 6, 2010. (Tr. pp. 358-362).

Plaintiff described herself as doing OK when she was seen again by Dr. Ehrensing on July 13, 2010 and she was feeling and sleeping better after resuming use of Effexor for a few days. Plaintiff was learning to cope with occasional memory lapses and was apparently selling snacks to generate some income. No anxiety or panic attacks were reported. Her affect was serious but she was able to smile appropriately. The diagnosis was unchanged and plaintiff was given medication refills. (Tr. pp. 526-527).

On August 24, 2010, plaintiff was seen by Dr. Hugh McGrath with presenting complaints being right knee pain, cervical spine discomfort, and bilateral CTS. The doctor reported results of testing done on March 29, 2010 as demonstrating mild degenerative changes at C5-6 with straightening of the normal lordotic curvature thought to be attributable to patient positioning and testing of the knee done on February 10, 2010 as revealing minimal degenerative changes. Upon physical examination, plaintiff had joint swelling and tenderness along with crepitus in the right knee but no tenderness in the left knee and the ligaments were intact bilaterally. Strength was 3/5 in the right hand but 5/5 elsewhere and sensation was intact although there was a bilateral tremor. The diagnosis was internal derangement of the right knee, bilateral CTS, trochantaric bursitis, lumbosacral disc disease, and cervical

spine disc disease.  For her CTS, plaintiff was prescribed nocturnal wrist splints to be used one at a time and although her bursitis had responded favorably to injection, it seemed to be complicated by lateral femoral cutaneous nerve involvement. Plaintiff was thought to be in need of arthroscopy of the right knee.  Physical therapy had not done much for plaintiff's cervical spine involvement but that was hoped to improve as she lost weight. (Tr. pp. 583-584).

As noted earlier, a hearing de novo before an ALJ went forward on September 14, 2010 with plaintiff and a VE in attendance.  After the documentary exhibits were admitted into evidence, plaintiff's counsel gave an opening statement in which she argued that plaintiff was disabled due to the combination of her various impairments. (Tr. pp. 33-35).  Plaintiff then took the stand and was questioned by the ALJ.  She was forty-two years of age and had completed seven grades of formal education, having dropped out of the eighth grade after becoming pregnant with her first child.  She was divorced, lived with her son, and subsisted on child support payments and unemployment benefits, the latter of which she had received since late 2008/early 2009.  Plaintiff testified that she had last worked in 2008 but upon further questioning by the ALJ it was revealed that plaintiff had earned $4,000 for performing childcare services in her home in 2009 which she later discontinued

secondary to mood swings and changes in her daily routine. (Tr. pp. 35-39).

Plaintiff was then questioned about her specific impairments. Lupus had not been formally diagnosed yet and she took no medication for it. Plaintiff was awaiting further test results for her CTS which made her hands lock up and caused her to drop things. She testified that she was unable to sleep with the recommended hand braces so she wore them during the day; surgery for that condition had reportedly been recommended after plaintiff underwent arthroscopy of the knee. Her right hand was worse than the left. Plaintiff's neck pain had improved with physical therapy but the right side of her body still hurt. She took medication, reclined, and used heat for pain relief but it persisted at a level of "6". Plaintiff testified that her knee was her main problem and she looked forward to surgery and the anticipated improvement. When asked about the existence of valvular heart disease, plaintiff stated that she took no medication for that condition and that the chest pain that she reportedly suffered may be due to her depression. Both her diabetes and her hypertension were controlled with medication. When queried about her monthly out-of-state visits to Dr. Morris for pain management medications, plaintiff explained that he was simply a less expensive provider. She denied any substance abuse issues or "doctor shopping" and disputed the

report of Dr. MacKenna to the contrary. (Tr. pp. 39-48).

Upon being tendered to her attorney for further questioning plaintiff testified that she additionally suffered from depression which left her fatigued and forgetful. Addressing the allegation of drug abuse and her related conviction, plaintiff explained that she was depressed at the time, had a prescription for the medication, but was unemployed and short of funds so she purchased the drugs directly from a nurse at half price and was ultimately placed on probation. When asked why she was unable to perform her previous work, plaintiff testified that manipulating and handling objects was problematic and it was unknown whether the contemplated CTS surgery would remedy that situation. In addition, she was mentally unprepared to cope with the demands of work due to problems in getting along with others, poor memory, and lapses in concentration. (Tr. pp. 48-51).

Deborah Bailey, a VE, was next to take the stand. She began by classifying the exertional and skill demands of plaintiff's past work as a cashier, cashier manager, restaurant manager, and shift supervisor as involving light and skilled or low semi-skilled work although the jobs were medium in nature as plaintiff had performed them. The ALJ then posed a series of hypothetical questions to the VE. In the first one, the VE was asked to assume an individual would could lift ten pounds occasionally, could only occasionally

use foot controls with the right foot, and required simple, repetitive, routine work. With those limitations in mind the VE testified that the individual described in the hypothetical question would be unable to perform plaintiff's past work. In the second hypothetical question, the VE was asked to assume the limitations contained in the first hypo and the individual could only frequently handle and finger bilaterally. Once again, the VE testified that the described individual could not perform plaintiff's past work. The VE was then asked whether there were any jobs that the individual described in the first hypothetical question could perform. In answer thereto, the VE identified the sedentary, unskilled jobs of cashier and information clerk that such an individual could perform, significant numbers of which existed in the local and national economies. Similarly, the VE testified that the individual who had been described in the ALJ's second hypothetical question could perform the sedentary, unskilled positions of information clerk and receptionist. However, if the individual was unable to work on a sustained basis due to medical conditions and pain there would be no jobs that the person could perform. Plaintiff's counsel had no questions for the VE. At the conclusion of the hearing the ALJ invited the submission of any other records plaintiff wished to have considered. (Tr. pp. 51-55).

Subsequent to the administrative hearing, plaintiff was

evaluated by Dr. Charles Billings for persistent right knee symptoms with an occasional feeling of buckling.   On physical examination, there was pain to palpation in the right medial joint line and a full range of motion with mild effusion.   There was increased pain with a McMurray's sign but no definite pop or click. Strength was normal, sensation was intact, and there was a full, pain-free range of motion of the left knee.   Straight leg raising was negative at 70 degrees.   The impression was a torn medial meniscus obliques tear to the right knee.   Spontaneous symptom improvement was thought to be unlikely so surgery was discussed and was agreed upon by plaintiff.   Topical Voltaren gel was to be used in the interim and plaintiff was to continue on her exercise program. (Tr. p. 582).   Preoperative testing was done on November 1, 2010 which included chest x-rays that revealed prominent cardiac size with clear lungs. (Tr. pp. 581, 596-597).

On November 10, 2010, plaintiff underwent right knee arthroscopy with a partial medial meniscectomy at the hands of Dr. Billings. (Tr. pp. 604-605).  Post-operatively, plaintiff was seen by Dr. Billings on November 23, 2010 and reported having fallen twice and having some popping in the right knee.   The surgical wounds were benign with no effusion, the knee had a functional range of motion, and the McMurray's sign was negative. The impression was osteoarthritis of the right knee and a prior partial

medial meniscectomy.   A short course of physical therapy was recommended, Vicodin ES was prescribed, and plaintiff was to return to the doctor in six weeks. (Tr. p. 580).

Plaintiff returned to Dr. Morris to obtain additional refills of her pain medication on January 19, 2011.  Once again, her pain was said to be well-controlled on her medication regimen at a level of "2".  The results of a physical examination of the knees were reported as revealing mild synovitis but no deformity, a full range of motion, and a steady gait.  There was no mention of plaintiff's knee surgery.  Medication refills were authorized. (Tr. pp. 609-613).   On that same day plaintiff also underwent diagnostic testing.  An MRI of the lumbar spine was normal but massive obesity was noted as was uterine enlargement and malposition for which pelvic sonograms were  recommended.  An MRI of the cervical spine demonstrated cervical spondylosis with multilevel mild cervical spinal stenosis, frank foraminal stenosis, and disc herniations with disc osteophyte complexes. (Tr. pp. 548-551).  Plaintiff would return to Dr. Morris on February 16 and March 14, 2011 to obtain further refills of her pain medication.  The treatment notes from those last two visits are identical. (Tr. pp. 614-618, 619-623).

Plaintiff's first challenge to the Commissioner's decision is that the residual functional capacity ("RFC") assessment that was made by the ALJ did not contain all of the restrictions that had

been noted by the Administration's MC, including restrictions against climbing and avoidance of extreme heat and cold.  The Court recalls that on April 14, 2010, Administration MC Anthony Scardino assessed plaintiff as being capable of performing a range of light-level work with postural limitations against climbing a ladder/rope/scaffolds and only occasional climbing of a ramp/stairs and crouching and environmental limitations against concentrated exposure to extreme cold and heat.  The ALJ, on the other hand, assessed plaintiff as having a RFC for sedentary work but with only occasional operation of a right foot control and involving work that was limited to simple, routine, and repetitive tasks.  Sedentary work being less rigorous than light-level work, 20 C.F.R. §404.1567(a) and (b), the RFC assessment that was arrived at by the ALJ was actually more restrictive than that which was arrived at by the MC.

In terms of the specific restrictions that plaintiff alleges were overlooked by the ALJ, Social Security Ruling ("SSR") 96-9p directs that "[p]ostural limitations ... related to such activities as climbing ladders, ropes, or scaffolds .... [or] crouching ... would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work."  SSR 96-9p, 1996 WL 374185 at *7. Similarly, "[i]n general, few occupations in the unskilled

sedentary occupational base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards." Id. at *9.  That being the case, the ALJ was not required to include in her RFC assessment the specific restrictions complained of by plaintiff as they are generally not involved in the performance of sedentary work.

Plaintiff's motion raises a number of other challenges that are related and will thus be addressed together.  She alleges that the ALJ accorded insufficient weight to her complaints of right-sided extremity pain, back pain, and neck pain. Plaintiff also complains that the ALJ erred in placing little importance on her diagnoses as a whole and their combined effect on her ability to maintain employment and that no restrictions on holding objects were recognized despite evidence of CTS.

The mere fact that a claimant has been diagnosed as suffering from various impairments does not compel the conclusion that she is disabled within the meaning of the Social Security Act. Celebrezze v. O'Brient, 323 F.2d 989, 990 (5th Cir. 1963).  Rather, the appropriate inquiry is whether a claimant's impairments result in functional limitations which render her unable to perform her past work or any other work.  Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990).  A review of the record reflects that the ALJ, in assessing plaintiff's RFC, fully considered her subjective

34

complaints, the objective medical evidence, and the opinion evidence as required by 20 C.F.R. §§404.1527 and 404.1529 and the applicable SSR's. (Tr. pp. 20-24). As respects plaintiff's chronic neck and right knee pain, the ALJ noted, first, Dr. Morris' repeated treatment records which indicated that her pain was well-controlled with medication and included her consistent descriptions of an improved quality of daily living. Pain is considered disabling within the meaning of the Social Security Act only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment. Hames v. Heckler, 707 F.2d 162, 166 (5th Cir. 1983). Plaintiff's pain was related to a herniation at C6-7 but without compromise of the spinal canal. Up until her knee surgery on November 20, 2010, plaintiff preferred to be medically managed and the absence of any significant findings in the six to eight months following the procedure supports the inference that it was largely successful in alleviating her knee symptoms. Villa, 895 F.2d at 1024.

As respects her neck, plaintiff had pinpoint tenderness in the shoulders anteriorly when she was seen on December 1, 2009 but with a full range of motion. Throughout her treatment history with Dr. Morris, plaintiff's neck pain was also said to be effectively managed with medication. On February 5, 2010, plaintiff reported that she could perform household chores, drive, shop, and go to

church weekly. Plaintiff's ability to perform such activities is not indicative of someone is who unable to perform any work whatsoever, <u>Leggett v. Chater</u>, 67 F.3d 558, 565 n. 12 (5th Cir. 1995), and reports such as the Function Report may properly be considered by the ALJ in determining a claimant's disability status. <u>Vaughan v. Shalala</u>, 58 F.3d 129, 131 (5th Cir. 1995). Despite her pain, plaintiff had no mechanical knee problems when she was seen on February 10, 2010 and range of motion was within normal limits. She was administered only an injection to the knee and was prescribed physical therapy. On March 9, 2010, intermittent knee pain was still present but it did respond to medication. Pain that can reasonably be controlled with medication or treatment is not disabling. <u>Johnson v. Bowen</u>, 894 F.2d 683, 686 (5th Cir. 1990). No significant neck discomfort was noted on a range of motion assessment and there was no clear evidence of cervical radiculopathy or CTS. Testing done on March 22, 2010 revealed only mild right and borderline mild left CTS but no EMG evidence of cervical or right lumbosacral radiculopathy. The Court also observes that CTS was not identified as a disabling condition in plaintiff's application for DIB and related paperwork. <u>Pierre v. Sullivan</u>, 884 F.2d 799, 802 (5th Cir. 1989).

Plaintiff reported a spike in her neck pain on March 24, 2010 but it appears to have been precipitated by the performance of a

good deal of housework. Cervical spine range of motion and postural exercises were to supplement those for plaintiff's knee in her physical therapy regimen. Soon thereafter the non-examining Administration MC opined that plaintiff was capable of light-level work. By May 3, 2010, plaintiff's neck pain had improved with physical therapy, the range of knee motion was within normal limits with no swelling or joint effusion, and the ligaments were stable. An injection to the knee was administered. On June 8, 2010, plaintiff reported to Dr. Pletsch that medication was controlling her pain quite well and that injections had helped her markedly. Strength was 5/5 throughout, sensation was intact, and gait was normal. Only Blu-Emu and hand braces were recommended for relief from CTS symptoms.

When seen by Dr. McGrath on August 24, 2010, testing that was done earlier in the year was interpreted as demonstrating only mild degenerative changes at C5-6 and minimal degenerative changes to the knee. Strength was 3/5 in the right hand but 5/5 elsewhere and sensation was intact. Nocturnal wrist splints were prescribed and plaintiff was advised to lose weight. At the administrative hearing, plaintiff testified to her continued receipt of unemployment benefits which, as the ALJ would subsequently note, was incompatible with her claim of disability. See, e.g., Jones v. Chater, 68 F.3d 467 (5th Cir. 1995). With specific reference to

37

plaintiff's allegations of an inability to work due to symptoms of CTS, the VE testified that an individual who could only frequently handle objects and finger bilaterally could still perform the sedentary, unskilled jobs of information clerk and receptionist. In light of the body of evidence that was before her, the Court believes the ALJ properly evaluated plaintiff's subjective complaints when weighed against the objective proof. <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1010 (5th Cir. 1987).

In another one of her various challenges to the Commissioner's decision, plaintiff alleges that the ALJ failed to arrange for a thorough physical and mental examination of her as allowed by 20 C.F.R. §404.1529 and SSR 96-7.

In addressing this challenge, the Court initially notes that the Regulation cited by plaintiff, §404.1529, has little to do with what a consultative evaluation is and when it may be appropriate but instead provides guidance on how the Commissioner is to evaluate a claimant's symptoms, including pain. Be that as it may, the law does impose certain duties upon the claimant in a Social Security proceeding, to-wit:

> ... you have to prove to us that you are blind or disabled. Therefore, you must bring to our attention everything that shows that you are blind or disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and, if material to the

determination of whether you are blind or
disabled, its effect on your ability to work
on a sustained basis.

* * * * * * * * * *

[y]ou must provide medical evidence showing
that you have an impairment(s) and how severe
it is during the time you say that you are
disabled.

20 C.F.R. §404.1512(a) and (c).

As was noted earlier, it is the claimant who bears the
ultimate burden of proving that she is disabled.  Harrell, 862 F.2d
at 475.  The Regulations further provide that:

[i]f you do not give us the medical and other
evidence that we need and request, we will
have to make a decision based on information
available in your case.

20 C.F.R. §404.1516.

Pertinent to the matter at hand, the Regulations provide the
following guidance:

[i]f your medical sources cannot or will not
give us sufficient medical evidence about your
impairment for us to determine whether you are
disabled or blind, we may ask you to have one
or more physical or mental examinations or
tests.

20 C.F.R. §404.1517 (emphasis
added).

As the wording of §404.1517 makes clear, the decision to order
a consultative evaluation is discretionary and may be required when
the record establishes that such an examination at government

39

expense is necessary to enable the ALJ to make a disability determination. Jones v. Bowen, 829 F.2d 524, 526 (5th Cir. 1987).

Plaintiff does not allege that any of her physicians recommended a consultative evaluation nor does she offer any suggestion of what such an evaluation would have revealed. It is also somewhat inconsistent to argue that the ALJ overlooked evidence of record establishing her disability, including statements from Dr. Morris declaring that she was unable to work, while maintaining that the ALJ erred in failing to generate additional medical evidence by way of one or more consultative evaluations. Absent any suggestion of what a consultative examination at government expense would have uncovered, plaintiff's speculative assertion that the ALJ failed to adequately develop the record fails to establish that level of prejudice necessary to obtain a reversal of the Commissioner's decision. See Newton v. Apfel, 209 F.3d 448, 458 (5th Cir. 2000).

Plaintiff additionally alleges that the doctors at Total Health Solutions found that she was completely disabled and that she would be a poor surgical candidate, opinions that the ALJ failed to address. As far as the record reflects, there is but one doctor who practices at Total Health, namely, Dr. Steve Morris. The first mention that was made of plaintiff being "completely disable[d]" came in Dr. Morris' treatment note of April 13, 2010.

(Tr. pp. 368-372).  The findings in that note, however, provide little support for that conclusion.  Just like all of the other treatment notes that he generated, the doctor indicated that plaintiff's pain was well-controlled on medication, at a level of "2" on a scale of 1 to 10.  With pain medication, plaintiff was repeatedly noted to "... describe[] [an] improved quality of life" and "improved funtion[ing] with activities of daily living." (Tr. p. 368).  Pain that can reasonably be controlled with medication or other treatment is not disabling.  <u>Johnson</u>, 894 F.2d at 686.  Given the level of pain control that the doctor was reportedly able to achieve, it is entirely understandable that plaintiff would prefer to be medically managed throughout the majority of the time period at issue.

The Court also observes that the objective findings in the doctor's note of April 13, 2010 are no different from the ones documenting plaintiff's most recent office visit prior to that on February 15, 2010.  In any event, a treating physician's statement that an individual is "disabled" or "unable to work" carries no special significance as that is a legal conclusion that is reserved to the Commissioner.  <u>Frank v. Barnhart</u>, 326 F.3d 618, 6230 (5th Cir. 2003)(citing 20 C.F.R. §404.1527(e)(1)).  As for Dr. Morris' opinion that plaintiff would be a poor surgical candidate, that statement is preceded by a pronouncement that she suffered from

41

lung disease and was obese.  Yet in the portion of the note containing the results of the doctor's physical examination, no adverse findings respecting the lungs are reported and lung disease is not included in the doctor's impressions.  Dr. Billings would later render contrary opinions with respect to surgical intervention to which plaintiff agreed and submitted to arthroscopic knee surgery on November 20, 2010.  The treatment notes documenting plaintiff's three post-surgical visits with Dr. Morris make no mention whatsoever of plaintiff's knee procedure and contain no findings that were different from the pre-surgical visits.  Based upon the relative dearth of medical records that were generated following plaintiff's surgery up until the action of the AC on August 12, 2011, it is not unreasonable to assume that plaintiff obtained significant relief from her knee symptoms as a result of that procedure.  The ALJ afforded Dr. Morris' opinions the weight that they deserved.  <u>Carrier v. Sullivan</u>, 944 F.2d 243, 247 (5th Cir. 1991); <u>Griego v. Sullivan</u>, 940 F.2d 942, 945 (5th Cir. 1991).

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate

judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this <u>25th</u> day of <u>February</u>, 2013.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

43